## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DAWN DELLAPA,**

      **Plaintiff,**

                            **Case No. 8:23-cv-703**

**v.**

**IEC U.S. HOLDINGS, INC. d/b/a**
**FLORIDA CAREER COLLEGE, a**
**Florida Profit Corporation,**

      **Defendant.**
_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dawn Dellapa ("Dellapa" or "Plaintiff"), by and through undersigned counsel, brings this Complaint against the Defendant, IEC U.S. Holdings, Inc. d/b/a Florida Career College, a Florida Profit Corporation ("IEC" or "Defendant"), and states as follows:

### PARTIES

1.    Plaintiff Dellapa is an individual over 18 years of age and is thus *sui juris*.

2.    Dellapa currently resides in Hillsborough County, Florida, and did at all times relevant to the allegations herein reside in Hillsborough County, Florida.

3.    Defendant IEC is registered with the Florida Secretary of State as a "Florida profit corporation," although its principal place of business is listed as being in California.

## JURISDICTION AND VENUE

4.      This is an action under federal, state, and local law.

5.      Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      The state law claim arises out of the same set of operative facts.

7.      As a result, the Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the United States District Court, Middle District of Florida, pursuant to 28 U.S.C. § 1391(b)(2) as the events or transactions out of which this claim arose occurred in Hillsborough County, which is located within the Middle District of Florida.

9.      Thus, the Tampa Division is the proper division.  M.D. Fla. Loc. R. 1.02(b)(4).

## GENERAL ALLEGATIONS

10.     Dellapa was employed at IEC's Tampa facility until October 4, 2021.

11.     On Monday, October 4, 2021, Dellapa was at work and started to feel a panic attack coming on.

12.     Dellapa is no stranger to panic attacks and knows what to do to help herself get through them without a problem.

13.     To that end, Dellapa determined she would benefit from moving to an area where there were fewer people around or even somebody she could talk to briefly.

14.     Dellapa walked down the hall and across the lobby, ending up in the financial aid office, where she sat down to talk to a co-worker.

15.     Dellapa told the co-worker in confidence that she was having a panic attack and that talking with someone might help her get her mind off of the matters triggering the panic attack.

16.     As the co-worker was relatively inexperienced, she informed Dellapa that she would get someone she felt was more suitable for Dellapa to talk with.

17.     Thereafter, Greta North ("North") entered the office and asked Dellapa what was wrong, at which point, Dellapa explained that she was having a panic attack and needed to either talk with someone for a few minutes or walk it off.

18.     North and Dellapa walked outside to an area with trees and open space so she could walk around.

19.     Dellapa informed North that Dellapa would be fine, and she just needed the opportunity to be left alone outside until the panic attack passed.

20.     North double-checked with Dellapa, asking her whether she was sure she would be okay, to which Dellapa responded "absolutely."

21.     Dellapa confirmed that she would return to her desk once the panic attack was over.

22.     Dellapa then began a quiet walk around the grounds, which eased the panic attack, as predicted.

23.     However, over the course of time, several other individuals began to emerge from the building to watch Dellapa.

24.     With each person that came out to stare at her, Dellapa could feel her panic attack building up again.

25.     Now that there were people around, Dellapa walked back towards the building to collect her purse for safekeeping.

26.     As she approached the building, Dellapa began to feel dizzy.

27.     Dellapa collected her purse, set it down near some trees, and laid down to ease the dizziness.

28.     Dellapa put on some meditation music to help her relax again.

29.     Three more people, including the President of the campus, CiCi Reidy ("Reidy"), came out of the building, upon which, Reidy approached Dellapa.

30.     Reidy asked Dellapa if she felt she needed medical attention, to which Dellapa replied "no" several times.

31.     Dellapa reiterated that if she could be left alone for a short period of time, the panic attack would pass and she could return to work.

32.     Reidy stomped off, apparently frustrated.

33.     Just as the panic attack began to subside, Reidy returned to where Dellapa was laying and resumed her inquiries.

34.     Reidy repeatedly asked Dellapa if she needed attention from emergency medical services ("EMS"), and, again, Dellapa confirmed that she did not.

35.     Reidy would not take "no" for an answer.

36.     Dellapa continued to peacefully lay in the grass listening to her meditation music, when she was suddenly surrounded by EMS personnel and law

enforcement.

37.     These individuals had been summoned by Reidy, despite Dellapa's unequivocal confirmation that she did not require medical attention and would be fine.

38.     Suffice it to say, this development exacerbated Dellapa's panic attack.

39.     Dellapa told the EMS providers that she was merely having a panic attack, that she wanted to be left alone, and that their services were not necessary.

40.     Dellapa informed everybody in no uncertain terms that if they would just let her be for a little while, she would be perfectly fine to go about her day.

41.     Dellapa asked the medical staff to leave, a decision that Reidy challenged quite vocally.

42.     Dellapa invited the law enforcement officer, Officer Terry Moncada Salazar ("Salazar"), to stay, as he seemed to be supportive.

43.     However, unlike the officer, Reidy was wholly unsupportive and her behavior became increasingly abusive and antagonistic.

44.     Dellapa felt she was being bullied, attacked, and humiliated by Reidy for no rational—or lawful—reason.

45.     Reidy's commentary and behavior was especially horrifying given her position of authority with IEC.

46.     Reidy escalated matters further by demanding that Salazar remove Dellapa from the property.

47.     Salazar informed Reidy that the most he could do would be to issue a trespass warning to Dellapa, but that was a decision that would be up to Reidy to

make.

48.    Dellapa was told that a trespass warning would make it impossible for her to re-enter IEC's property for a year or possibly more.

49.    Prohibiting Dellapa from entering the property would be tantamount to firing Dellapa.

50.    Still dizzy from the ordeal, and not yet past her panic attack, Dellapa was escorted to her car by Salazar and she began to drive home.

51.    After Dellapa left, Salazar approached Reidy and asked her if she wanted to trespass Dellapa from the property.

52.    Reidy confirmed that she did want to trespass Dellapa.

53.    Meanwhile, Dellapa found a nearby parking lot and parked her car.

54.    Dellapa took some deep breaths, and, through sobs, called a friend and told her what had happened.

55.    After regaining her composure, Dellapa realized that her personal effects were still at the IEC campus.

56.    Dellapa called over to IEC to see if she could retrieve her belongings, but Reidy reaffirmed her decision to ban Dellapa from the property.

57.    Instead, a coworker walked Dellapa's things out to her, although she forgot to include a few items.

58.    Reidy reportedly told everyone at the office that she thought Dellapa needed to be "Baker acted" and that she was "not right."

59.    Reidy made jokes about Dellapa's disability/handicap, and cruelly

suggested that she had seen Dellapa taking off her undergarments in an effort to gain favor with Officer Salazar.

60.    These were absolutely false statements that made their rounds at the IEC office.

61.    Dellapa dual-filed a charge of discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC") on or about May 31, 2022.

62.    More than 180 days have passed since the filing of the charge of discrimination.

63.    The EEOC issued a dismissal and notice of rights on or about January 27, 2023.

64.    This lawsuit is therefore timely filed, with Dellapa having fulfilled all conditions precedent to this lawsuit.

65.    As a direct and proximate result of the Defendant's violations of law, described herein, Dellapa has required the services of undersigned counsel, to whom she is obligated to remit fees and costs.

## COUNT I (ADA DISABILITY DISCRIMINATION)

66.    Dellapa reaffirms and realleges paragraphs 1-65, above.

67.    At all relevant times, the Defendant employed fifteen or more individuals.

68.    As such, the Defendant was an employer within the meaning of the Americans with Disabilities Act of 1990, as amended by the Americans with

Disabilities Act Amendments Act ("ADA"), and the Florida Civil Rights Act of 1992 ("FCRA").

69.     Dellapa suffered from and continues to suffer from a disabling condition/handicap.

70.     Specifically, Dellapa experiences anxiety and panic attacks, which are symptoms of her post-traumatic stress disorder.

71.     Dellapa's major life functions, such as concentrating, thinking, communicating, and interacting with others were and are substantially limited by her disabling condition.  *See* 29 C.F.R. §1630.2(j)(3).

72.     Despite her disability/handicap, Dellapa was able to perform the essential functions of her job with the Defendant with or without a reasonable accommodation, *inter alia* by taking short breaks on occasion to manage her panic attacks.

73.     When Reidy trespassed Dellapa from the IEC property, Dellapa was constructively if not actually discharged, as she would have been prohibited by law from coming to work.

74.     In terminating her employment, the Defendant discriminated against Dellapa because of her actual disability/handicap and/or because it perceived her as having a disability/handicap.

75.     As a direct and proximate result of the Defendant's unlawful conduct, Dellapa has suffered damages, including, but not limited to, lost pay, lost benefits, mental anguish, loss of the capacity to enjoy life, and lost future earnings.

76.     These damages have occurred, are on-going, and are reasonably likely to continue into the indefinite future.

WHEREFORE, Dellapa respectfully demands this Court enter judgment against the Defendant for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages; and

e.  Reasonable attorneys' fees and costs.

## COUNT II (FCRA HANDICAP DISCRIMINATION)

77.     Dellapa reaffirms and realleges paragraphs 1-65 and 67-76, above.

78.     The Defendant's actions in trespassing and effectively terminating Dellapa were willful and/or in reckless disregard for Dellapa's legal rights, in that the Defendant is a large corporation with ample resources to know that its conduct was illegal.

WHEREFORE, Dellapa respectfully demands this Court enter judgment against the Defendant for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

    d.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

    e.  Punitive damages; and

    f.  Reasonable attorneys' fees and costs.

## COUNT III (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

79.    Dellapa reaffirms and realleges paragraphs 1-65, above.

80.    The Defendant recklessly and/or deliberately inflicted mental suffering on Dellapa during the events described herein.

81.    The Defendant's conduct was outrageous.

82.    Specifically, the Defendant, via Reidy, humiliated Dellapa on October 4, 2021 in full view of many other individuals, during a time when Dellapa was having an episode related to her disabling condition.

83.    The Defendant's conduct caused Dellapa severe emotional distress.

84.    The Defendant's acts were willful and/or in reckless disregard for Dellapa's legal rights, in that the Defendant is a large corporation with ample resources to know that its conduct was illegal.

WHEREFORE, Dellapa respectfully demands this Court enter judgment against the Defendant for the following:

    a.  Interest on the amounts awarded, consistent with law;

    b.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering; and

    c.  Punitive damages.

## <u>JURY TRIAL DEMAND</u>

The Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 29th day of March, 2023.

*/s/ Shaina Thorpe*

**SHAINA THORPE**
Florida Bar No. 0055464
Primary: shaina@thorpelaw.net
Secondary:  admin@thorpelaw.net

**THORPELAW, P.A.**
1228 East 7th Ave., Suite 200
Tampa, Florida 33605
Telephone: (813) 400-0229
Fax: (813) 944-5223

*Counsel for Plaintiff Dawn Dellapa*
